UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ISRAEL WEBB,

    Plaintiff,

  v.                                                                                                 Case No. 25-CV-648-SCD

MILWAUKEE POLICE DEPARTMENT and
DARIUS WADE,

    Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This case arises out of the non-fatal shooting of Israel Webb by Milwaukee police officer Darius Wade. Webb is proceeding on an excessive force claim against Officer Wade based on complaint allegations that the officer shot Webb while Webb was unarmed, compliant, and partially handcuffed. He also alleges that the police department failed to properly train the officer. The defendants have moved to dismiss the complaint, arguing that footage from Officer Wade's body camera clearly contradicts Webb's allegations of excessive force and that I can consider the footage because Webb referenced the body cam in his complaint and because it is central to his claims. I agree that the body-cam evidence was incorporated by reference. I also agree that, given the uncontroverted body-cam evidence, the complaint fails state a claim to relief that is plausible on its face, and any attempt to amend would be futile. Accordingly, I will grant the defendants' motion to dismiss this action with prejudice.

## BACKGROUND

On May 5, 2025, Israel Webb filed a complaint under 42 U.S.C. § 1983 against the Milwaukee Police Department and one of its police officers, Darius Wade. *See* Compl., ECF No. 1. The complaint alleges that Webb was unarmed, non-threatening, and under emotional stress when Officer Wade shot him on November 14, 2022. *See id.* at 2–3. The incident began when Webb's neighbors called the police and gave them bad information. Officer Wade arrived at Webb's home to investigate the complaint; according to the complaint, he was alone, unprepared, and unprofessional. Due to allegedly poor training and failure to practice protocols, Officer Wade stumbled, and "his body camera fell off." *Id.* at 3. Webb was upset and emotional at the time, but he still complied when Officer Wade cuffed one of his hands. Officer Wade, however, failed to simply cuff the other hand. When Webb attempted to ask a question and tried to surrender, Officer Wade shot him while Webb's hands were up and one hand was cuffed. Webb spent ten months in jail before the charges against him were dropped.

The matter was randomly assigned to me. I screened Webb's complaint in accordance with 28 U.S.C. § 1915 and allowed him to proceed on two claims: excessive force against Officer Wade (in his official capacity) and failure to train against the police department. *See* Screening Order, ECF No. 4. The defendants waived service of the complaint, *see* ECF No. 8, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), *see* ECF Nos. 3 & 7.

On July 30, 2025, the defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. to Dismiss, ECF No. 10; Defs.' Br. in Supp., ECF No. 11. The defendants submitted a declaration in support of their motion, attached to which is a copy of the footage Officer Wade's body-worn camera captured of the

2

incident on November 14, 2022. *See* McCabe Decl., Ex. 1 (electronically stored in clerk's office). That video tells a very different story than Webb alleges in his complaint.

The video is nearly thirty-five minutes long. It begins with Officer Wade approaching a multi-unit residence at night. Ex. 1, at 00:29:16–00:29:58.[1] He knocks on the door marked "2348," and two residents from the unit next door answer. *Id.* at 00:29:58–00:30:54. They tell Officer Wade that the entrance to "2348A" is in the back. *Id.* at 00:30:54–00:31:12. They also confirm that Dorothy—a tiny, little old lady who has dementia and wears wigs—lives there with her nephew, Israel, and that Israel has significant mental health issues. *Id.* at 00:31:12–00:33:07. Officer Wade explains that someone called the police asking them to check on Dorothy and expressing concern about Israel.

Officer Wade proceeds to the back of the residence and knocks on the side door. Ex. 1, at 00:33:07–00:34:06. Webb opens a window, confirms that Dorothy lives there, and tells Officer Wade he can come inside and check on her. *Id.* at 00:34:06–00:34:26. After several minutes go by, Webb unlocks the side door and lets Officer Wade in the back stairwell. *Id.* at 00:34:26–00:37:05. Webb insists that Officer Wade enter the unit first so he can "make sure [the officer is] out." *Id.* at 00:37:05–00:37:15. He then grabs what looks like a round weightlifting plate, follows Officer Wade inside, closes the unit door behind him, and blocks the door with the plate "because it swings open." *Id.* at 00:37:15–00:37:36.

Officer Wade and Webb enter a very small living room; the lights are off. Ex. 1, at 00:37:15–00:37:36. Webb initially tells Officer Wade that Dorothy is in her bed, and he opens the door to a bedroom. Ex. 1, at 00:37:21–00:37:56. However, when Officer Wade asks Webb

---

[1] Timestamps are to the time listed on the top right corner of the video. It appears the incident began at about 12:29 a.m. on November 14, 2022.

to go in that room, Webb turns on the living room lights, says that Dorothy is actually "right here," and points to the living room couch, which is covered in a blanket. *Id.* at 00:37:56–00:38:15. Officer Wade calls out Dorothy's name, but she doesn't answer. *Id.* at 00:38:15–00:38:23. When Officer Wade asks if Dorothy is sleeping, Webb says "yes" and explains that she's been sleeping "since like six." *Id.* at 00:38:23–00:38:38. Officer Wade asks why the blanket is covering Dorothy's face. *Id.* at 00:38:38–00:38:55. At first, Webb says it's because he had the window open. He then briefly lifts the blanket off Dorothy's face, says she has a blanket on because she's sleeping, and covers her back up.

Officer Wade asks Webb to step back so he can check himself. Ex. 1, at 00:38:55–00:39:11. He lifts the blanket and calls out Dorothy's name a few times; again, no answer. Officer Wade asks Webb why Dorothy has "flowers and stuff" all around her face. *Id.* at 00:39:11–00:39:14. Webb whispers, "She's dead." *Id.* at 00:39:14–00:39:16.

After discovering Dorothy's dead body, Officer Wade orders Webb to step back, put his hands up, turn around, and place his hands behind his back. Ex. 1, at 00:39:16–00:39:50. Webb complies initially. Officer Wade then pulls out his handcuffs and tells Webb to face away from him, but Webb keeps looking back over his shoulder and says he's worried about getting shot in the back. *Id.* at 00:39:44–00:40:07. When Officer Wade attempts to cuff Webb's right hand, Webb pulls it away. *Id.* at 00:40:07–00:40:27. Officer Wade then removes his taser and warns Webb that he's going to be tased if he doesn't comply. Webb turns around and repeatedly asks Officer Wade to shoot him in the face. *Id.* at 00:40:27–00:41:08. Officer Wade tells Webb to not move and to put his hands up because, according to Wade, Webb's movement is making him nervous. *Id.* at 00:40:55–00:41:18. With the taser aimed directly at him, Webb complies.

4

Next, Officer Wade orders Webb to get on the ground on his stomach. Ex. 1, at 00:41:18–00:41:30. Webb instead gets on his knees and again asks Officer Wade to "please shoot me." *Id.* at 00:41:21–00:41:41. He finally gets down on his stomach after Officer Wade tells him he's going to get tased. While Webb is lying on the ground, there's a backpack just to his right with two poles or pipes protruding out. Officer Wade orders Webb to put his hands behind his back. *Id.* at 00:41:37–00:41:53. Webb slowly moves back his right arm, and Officer Wade cuffs Webb's right wrist. Officer Wade then tells Webb to place his other hand behind his back. *Id.* at 00:41:53–00:42:00. Webb doesn't immediately comply; instead, he starts to pull with his (cuffed) right arm. Officer Wade tells him to stop resisting. Webb eventually puts his left hand behind his back, and Officer Wade orders him not to move. *Id.* at 00:42:00–00:42:06.

When Officer Wade holsters his taser and attempts to cuff Webb's left wrist, Webb suddenly turns around, gets up, and lunges at the officer. Ex. 1, at 00:42:06–00:42:12. Officer Wade's body camera falls off during the scuffle, so we're left with just the audio. You can hear Officer Wade yelling, "Stop resisting!" and "Stop!"; what sounds like broken glass, or possibly wind chimes; and Webb saying, "Don't make me kill you." *Id.* at 00:42:12–00:42:26. As Webb begs Officer Wade to shoot him in the head, Officer Wade uses his radio to call for backup ("Get another squad in here, now!"); tells Webb to "Stop!"; and warns Webb that he'll be shot if he doesn't stop resisting. *Id.* at 00:42:26–00:42:38.

Officer Wade repeatedly orders Webb to "Drop the pole!"—I count ten times—saying he doesn't want to shoot him, and tells Webb to get on the ground. Ex. 1, at 00:42:38–00:43:20. Repeatedly, Webb begs Officer Wade to shoot him "right in the head" or "right in the face." You can then hear the distinct sound of a taser being deployed and Officer Wade

5

continuing to command Webb to "drop it." *Id.* at 00:43:20–00:43:34. As Webb again begs Officer Wade to shoot him in the face, the officer repeatedly yells, "Drop the weight!"; "Drop it!"; and "Drop it right now!" *Id.* at 00:43:34–00:43.45. Officer Wade then radios that the subject is being held at gunpoint and that he needs another squad. *Id.* at 00:43:45–00:43:48. You hear what sounds like a battering ram, another taser strike, and finally, three or four gunshots. *Id.* at 00:43:48–00:43:58. Wade show Webb in the chest and the arm, and he survived the shooting. *See id.* at 00:43:58–01:04:10. Again, the crucial portion is available only on audio because the camera had fallen to the floor.

## MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, "a complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint satisfies this pleading standard when its "'factual allegations . . . raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To analyze the sufficiency of a complaint[, courts] must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

## DISCUSSION

The defendants argue that Webb's complaint, which he filed without the assistance of counsel, fails to state a claim that is plausible on its face. "Section 1983 of Title 42 authorizes

6

a federal cause of action against any person who, acting under color of state law, deprives another of rights secured by federal law or the United States Constitution." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). I can reasonably infer from the complaint that Officer Wade was acting under color of state law when he shot Webb. Thus, the only issue is whether the complaint plausibly alleges that Officer Wade deprived Webb of a federal constitutional right. Webb alleges that Officer Wade shot him while he was unarmed, compliant, and partially handcuffed. *See* Compl. 2–3.

"The use of force against a suspect is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). In determining whether reasonable force was used, reviewing courts must "balance the extent of the force used against the need for it." *Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 959 (E.D. Wis. 2003) (citing *Garner*, 471 U.S. at 7–8). Here, the extent of force used was deadly force—Officer Wade shot Webb in the chest. *See id.* at 959–60 (classifying use of force as "deadly" when it creates "a substantial risk of death or serious injury to plaintiff") (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)). "Deadly force may be used if an officer has probable cause to believe that the suspect's actions place the officer or others in imminent danger of death or serious bodily harm." *Id.* at 960 (citing *Garner*, 471 U.S. at 11; *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002)).

"When determining the reasonableness of the force used, [reviewing courts] consider the factors considered in *Graham v. Connor*, 490 U.S. 386 . . . (1989)." *Smith*, 10 F.4th at 736. "The *Graham* factors include the severity of the crime at issue, the immediate threat the suspect posed to the safety of the police officers and others, and if the suspect actively resisted

or attempted to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396). Courts also consider "whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Id.* (quoting *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015)). "The fundamental question is 'whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Id.* (quoting *Garner*, 471 U.S. at 8–9).

"Courts assess the totality of the circumstances from the perspective of a reasonable officer on the scene." *Smith*, 10 F.4th at 736 (citing *Graham*, 490 U.S. at 396). "This perspective is critical." *Id.* (quoting *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)). Reviewing courts "must consider the amount and quality of the information known to the officer at the time." *Id.* (quoting *Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018)). "This includes 'the level of duress involved[] and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Id.* (quoting *Siler*, 957 F.3d at 759).

"When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the [person] poses an immediate threat to the safety of the officers or others." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)). "If the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown." *Id.* (citing *Sanzone*, 884 F.3d at 740). "This is so even if a less deadly alternative is available to the officers." *Id.* (citing *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994)). "And this is so whether or not the targeted

person suffers from a mental illness—the critical consideration is whether he or she poses an immediate threat to the officers or others." *Id.*

As explained above, in reviewing a motion to dismiss, I must "accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). The wrinkle in this case is that the defendants insist that the complaint's facts are not well-pleaded. More specifically, they argue that the footage from Officer Wade's body camera clearly contradicts Webb's allegations of excessive force. *See* Defs.' Br. 2–6. "In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim.'" *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quoting *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992)). District courts may also "examine exhibits, including video exhibits, attached to the complaint, or referenced in the pleading if they are central to the claim." *Esco*, 107 F.4th at 678 (citing *Bogie*, 705 F.3d at 609).

Webb did not attach the body-cam footage to his complaint, but he did specifically reference Officer Wade's body camera, and that footage is central to Webb's excessive force and failure to train claims. Webb alleges that Officer Wade's "body camera fell off" when he "stumbled due to poor training and practicing of protocols." Compl. 3. Webb also alleges that he was unarmed, non-threatening, and compliant at the time of the shooting. *See id.* at 2–3. The footage captures via video and/or audio the entire interaction between Officer Wade and Webb on the night in question. Because the body-cam footage was incorporated into the complaint by reference, I can consider it without having to convert the defendants' motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

9

"Although a district court, in a motion to dismiss, must take the plaintiff's well-pleaded facts as true, when an exhibit, including a video exhibit, 'incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.'" *Esco*, 107 F.4th at 678–79 (quoting *Bogie*, 705 F.3d at 609). "This is because to survive a motion to dismiss, the complaint must 'state a claim to relief that is plausible on its face.'" *Id.* at 679 (quoting *Twombly*, 550 U.S. at 570). "A complaint that contradicts uncontroverted video is not plausible." *Id.* "The plaintiff can still contest the meaning or significance of the exhibit, but where the plaintiff's case depends on contradicting a fact that seems plain from the exhibit, the plaintiff will 'need[] to explain [his] position.'" *Id.* (quoting *Bogie*, 705 F.3d at 609).

The body-cam evidence incontrovertibly contradicts the complaint's allegations. Webb says that Officer Wade was unprofessional; the video shows Officer Wade treating Webb respectfully (e.g., calling him "sir"), at least up until he discovered Dorothy's dead body. *See* Ex. 1, at 00:34:05–00:39:25. Webb says that Officer Wade's body camera fell off when he stumbled; the video shows the camera fell off when Webb lunged at the officer and engaged in a scuffle. *See id.* at 00:42:05–00:42:15. Webb says that he was compliant and tried to surrender; the video shows that, while Webb complied with certain orders, he failed to listen to many others: looking back when Officer Wade told him not to look at him, pulling his hand away when Officer Wade first tried to cuff him, not immediately getting down on his stomach, not putting both hands behind his back when he did finally lie down, pulling away his cuffed right hand, lunging at the officer when he was told not to move, and not dropping the pole or the weight. *See id.* at 00:39:17–00:44:00.

10

Relatedly, Webb alleges he was unarmed and non-threatening; but on the video, you can clearly hear Webb say, "Don't make me kill you," and you can hear Officer Wade repeatedly tell Webb to "Drop the pole!" and "Drop the weight!" *See* Ex. 1, at 00:42:23–00:44:00. Those moments were not captured visually, but there's no reason to doubt their veracity. Indeed, before the camera was knocked off, you see Webb blocking the unit door with a weightlifting plate and two poles sticking out of a backpack that is lying on the living room floor. *See id.* at 00:37:17–00:42:10. There's also no reason to believe that the body-cam evidence was tampered with, as Webb asserts in his response brief. *See* Pl.'s Resp., ECF No. 19. Thus, the body-cam evidence controls over the complaint's allegations.

The uncontroverted body-cam evidence shows that Webb's allegations of excessive force are not plausible. Officer Wade was at the residence for a welfare check. *See* Ex. 1, at 00:30:45–00:33:09. Webb let Officer Wade inside and initially told the officer that Dorothy was sleeping in her bedroom. *See id.* at 00:34:05–00:38:08. In fact, her dead body was on the living room couch covered in a blanket and flowers. *See id.* at 00:38:08–00:39:17. After discovering the dead body, and not knowing the circumstances of Dorothy's death, Officer Wade reasonably attempted to handcuff Webb. *See id.* at 00:39:17–00:40:20. However, Webb disobeyed Officer Wade's command not to look at him, and Webb pulled his hand away when the officer tried to cuff him. Officer Wade then unholstered his taser, but Webb still didn't immediately get on the ground with his hands behind his back, as the officer instructed. *See id.* at 00:40:20–00:42:05. Instead, he repeatedly asked Officer Wade to shoot him in the face.

Webb eventually got on the ground and let Officer Wade cuff his right wrist, but when Wade attempted to cuff the left one, Webb suddenly got up and lunged at the officer. *See* Ex. 1, at 00:41:30–00:42:14. Webb said, "Don't make me kill you," grabbed a pole, and refused

11

repeated commands to drop the object. *See id.* 00:42:14–00:43:20. Before discharging his firearm, Officer Wade attempted to subdue Webb with a taser. *See id.* at 00:43:20–00:43:55. It didn't work. Webb picked up the weightlifting plate, refused more commands to put it down, and was tased a second time. Then Officer Wade fired his gun, striking Webb in the chest. *See id.* at 00:43:55–00:45:25. The entire time, Webb was begging Officer Wade to shoot him "right in the face, please! Do it!" Even after the shots rang out, Webb was exhorting Wade to "kill me! Kill me!"

Considering the *Graham* factors and the totality of the circumstances, Officer Wade's use of deadly force was objectively reasonable. The crime that Officer Wade discovered was severe, as Webb lied by omission in not telling the officer that Dorothy was dead. Although at times Webb complied with Officer Wade's lawful orders, he refused to obey several others and got on the ground only after being threatened with a taser. He also actively resisted Officer Wade's attempts to handcuff him, lunged at the officer (knocking off his body-warn camera), and armed himself with a pole and a weightlifting plate. The fact that Officer Wade was alone with Webb in a cramped room and that Webb had barricaded the door intensified the level of threat he posed. It's also important to note that Officer Wade first attempted to gain compliance with less severe measures of force and that he discharged his firearm only after those methods proved ineffective. Officer Wade did not need to wait to be struck with the pole or the weightlifting plate before using deadly force on a non-compliant, actively resisting suspect who lied about his roommate being dead in the room with them. In sum, the complaint does not plausibly allege an excessive force claim against Officer Wade.[2]

---

[2] Because Officer Wade did not deprive Webb of his constitutional rights, the officer is immune from liability. *See Marion v. City of Corydon*, 559 F.3d 700, 706 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Akande v. Grounds*, 555 F.3d 586, 590 (7th Cir. 2009)).

Webb's claim against the Milwaukee Police Department also fails. For one, the police department cannot be sued directly, as it is simply an arm of the city. *See Grow v. City of Milwaukee*, 84 F. Supp. 2d 990, 995–96 (E.D. Wis. 2000) (citing Wis. Stat. § 62.50; *Buchanan v. City of Kenosha*, 57 F. Supp. 2d 675, 678–79 (E.D. Wis. 1999); *Abraham v. Piechowski*, 13 F. Supp. 2d 870, 879 (E.D. Wis. 1998)). Moreover, substituting the City of Milwaukee as a defendant, *see* Fed. R. Civ. P. 21, would not save Webb's claim, because without an underlying constitutional violation by Officer Wade, there can be no municipal liability under § 1983. *See Marion*, 559 F.3d at 706 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). The complaint therefore does not plausibly allege a failure to train claim against the police department.

## CONCLUSION

Because Webb's allegations of excessive force contradict the uncontroverted body-cam evidence, the complaint does not state a claim to relief that is plausible on its face. Accordingly, for all the foregoing reasons, the court **GRANTS** the defendants' motion to dismiss, ECF No. 10; and **DENIES as moot** the defendants' motion to stay proceedings, ECF No. 12.

I will not give Webb a chance to file an amended complaint. "Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 & n.3 (7th Cir. 2004)). In this case, it is certain from the face of the complaint that any amendment would be futile. "No additional information or materials [Webb] could provide would render his constitutional

13

claims legally viable or plausible." *Bey v. Ayers*, No. 24-1560, 2024 WL 4823870, 2024 U.S. App. LEXIS 29333, at *14 (7th Cir. Nov. 19, 2024). Thus, the clerk of court shall enter judgment that this entire action is **dismissed with prejudice** and that Webb shall take nothing from any of the defendants by his complaint.

    **SO ORDERED** this 25th day of November, 2025.

                                                                   STEPHEN C. DRIES
                                                                   United States Magistrate Judge